## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

GLOBAL TECHNOLOGY FINANCE
CORPORATION and McBRIDE
FINANCIAL CORPORATION,

                Plaintiffs,                                Civ. No. 02-648 MV/ACT

vs.

BAE SYSTEMS MISSION SOLUTION,
INC.,

                Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Motion to Stay Enforcement of Writ of Execution, filed June 5, 2002 **[Doc. No. 2]**.  The Court, having considered the motion, briefs, relevant law and otherwise being informed fully, finds that the motion is well-taken and will be **GRANTED as more fully explained in this opinion.**

### BACKGROUND

Plaintiffs McBride Financial Corporation (MFC) and Global Technology Finance (GTF) seek a stay of the writ of execution obtained by Defendant BAE Systems Missions Solutions, Inc. (BAE) to enforce a judgment entered against McBride and Associates (McBride) by the United States District Court for the Eastern District of Virginia.[1]  Defendant claims that, in addition to the judgment, it holds a security interest in the property it seeks, pursuant to a settlement agreement

---

[1]There has been some confusion among the parties as to their proper denominations in this case.  Regardless of how the parties may have self-titled their briefs, the proper designations are as used in this Memorandum Opinion and Order.

Defendant and McBride had signed several months before the judgment was issued.  Plaintiff claims that the settlement agreement did not validly give Defendant any security interest in McBride's assets; moreover, Plaintiff claims to hold a perfected security interest that is superior to any interest Defendant may have in McBride's property.

McBride, incorporated in New Mexico, is the successor corporation to a sole proprietorship that was founded by Theresa McBride in or around 1985.  The company sells computer equipment, software, and related services primarily to the federal government, but also to various state and local governments.  (Trans. at 36.)  Between 1986 and 1999, the company operated profitably.  In 1999, McBride acquired Marconi Enterprise Solutions, a division of BAE.  That same year, McBride began suffering significant economic losses.  (Trans. at 37.)  Following these developments, in the fall of 2000, McBride's principal finance company, IBM Global Credit (IBM), notified McBride that it would not be renewing McBride's credit line as of January 2001.  (Trans. at 37.)  IBM also stated that it was going to exercise its rights as McBride's senior secured creditor and satisfy McBride's outstanding debts by collecting on McBride's receivable accounts.  (Trans. at 38.)  In the process of seeking refinancing for the company, Theresa McBride and John Irick (former consultant to and current Chief Financial Officer of McBride) were introduced to Paul Stemler, president of Plaintiff GTF.  (Trans. at 38.)  GTF is a limited liability company founded in 1998 and majority owned by Credit Suisse First Boston.

GTF offered to finance and establish a special purpose entity that would allow McBride to continue operations after IBM had closed off its line of credit.  (Trans. at 38.)  Since McBride's credit line was about to be terminated, the entity would work to secure its own line of credit, take purchase orders, and deliver products to McBride's former customers.  McBride would act as an "agent" of

the special purpose entity and therefore be able to continue operations, albeit in a slightly different manner.  In return for these services, the entity would charge McBride a management fee.[2]

Once McBride agreed to enter into this type of arrangement, GTF established MFC as a limited liability corporation, wholly owned by GTF, to serve as that special purpose entity in June 2001.

Meanwhile, McBride and BAE had entered into litigation over disputes related at least in part to the transaction involving Marconi Enterprise Solutions.  On December 13, 2001, McBride entered a settlement agreement with BAE terminating the lawsuit.  Under the terms of the settlement, McBride accepted an adverse judgment and agreed to pay BAE $708,356.13 in five monthly installments between January 2002 and April 2002 (Settlement Agreement ¶ 1.6).  In addition, McBride "agree[d] to grant BAE Systems a lien against its assets pursuant to Article I of the Uniform Commercial Code" for that sum (Settlement Agreement ¶ 1.5).  A judgment was entered in the above amount against McBride by the United States District Court in the Eastern District of Virginia on December 21, 2001.

Subsequently, on January 10, 2002, McBride executed a security agreement with MFC and GTF, in which McBride granted MFC and GTF "a security interest and continuing lien on all of such [McBride's] right, title and interest in, to and under all personal property" then owned or thereafter acquired by McBride.  (Security Agreement ¶ 2.1.)  On January 15, 2002, MFC filed a financing statement with the New Mexico Secretary of State, designating MFC[3] as the secured party and

---

[2]MFC and McBride signed a management agreement in August 2001 (Management Agreement) that provides a detailed description of how the businesses would operate and the responsibilities of each to the other.

[3]The financing statement nowhere listed GTF as a party to the underlying transaction.

McBride as the debtor, and listing "all personal property" of McBride as collateral covered by the security agreement.  (MFC Financing Statement.)

The first payment under the McBride-BAE settlement agreement was scheduled for January 31, 2002.  John Irick, Chief Financial Officer of McBride, testified before this Court that during January 2002, McBride communicated to BAE that it was attempting to meet its settlement obligations.  (Trans. at 79.)  Nevertheless, McBride ultimately defaulted on the January payment. When McBride failed to make any payments by the second scheduled date (February 28, 2002), BAE filed a financing statement with the New Mexico Secretary of State, indicating it held a judgment lien against "[a]ll assets of the Debtor [McBride], including accounts receivable and inventory, in the amount of $708,356.13" pursuant to the December 2001 settlement agreement between the parties. (BAE Financing Statement.)

On May 30, 2002, the United States District Court in the Eastern District of Virginia certified the December 2001 judgment against McBride for registration in the District of New Mexico.  The following day, the certified judgment was filed with the United States District Court for the District of New Mexico, and a Writ of Execution was issued to satisfy the judgment.

On June 5, 2002, the day the Writ was scheduled for service, Plaintiffs MFC and GTF filed the pending motion requesting a stay of Defendant BAE's writ of execution pursuant to Rule 69 of the Federal Rules of Civil Procedure.  The same day, this Court entered a temporary stay until final resolution of the motion.

Plaintiff alleges that under Rule 69 and New Mexico law, only property belonging to the judgment debtor -- here, McBride -- is available to satisfy the judgment on the BAE-McBride dispute. However, "pursuant to the MFC Security Agreement and MFC Financing Statement, all assets and

property and inventory of McBride is [sic] either owned by, or pledged to, MFC and is [sic] not 'property to satisfy [Plaintiff's] judgment.'"   (Pl.'s Mot. to Stay Enforcement at 5.) Plaintiff emphasizes that it perfected its security interest on January 15, 2002, when it filed a financing statement with the New Mexico Secretary of State, but that BAE did not perfect whatever interest it might have had until February 28, 2002, the date BAE filed its financing statement.  Under New Mexico statutes governing the effect of perfection or nonperfection and priorities of competing security interests, a perfected security interest has priority over a competing unperfected security interest. *See* N.M. STAT. ANN. § 55-9-322(a)(2).  Accordingly, Plaintiff claims its interest has priority over that of BAE.  (Pl.'s Mot. to Stay Enforcement at 6.)

In its response, Defendant BAE, the judgment creditor, argues that MFC's security interest is invalid because it is based on a fraudulent security agreement that was created so McBride could avoid its debt obligation to BAE.  (Def.'s Resp. at 3-5 (citing N.M. STAT. ANN. §§ 56-10-18 to 56-10-21)).  Accordingly, it urges the Court to deny the motion.[4]

Plaintiff's reply counters that MFC and McBride are distinct corporate entities and that the GTF/MFC-McBride security agreement reflects a valid, arms-length transaction.  (Pl.'s Reply at 2-3.) Plaintiff contends that the McBride-BAE settlement agreement did not create any valid security interest in McBride's assets.  Citing the requirement that a description of collateral subject to a Uniform Commercial Code lien reasonably identify the encumbered property, *see* N.M. STAT. ANN.

---

[4]Initially, Defendant also suggested that neither GTF nor MFC had standing to bring the motion because neither company was incorporated validly in Delaware at the time the motion was filed.  However, in its Reply brief, Plaintiff stated that it had "confirmed the status of both corporations with the Delaware Secretary of State Corporate Status inquiry telephone line on June 7, 2002" and that Defendant's claims as to standing were moot.  (Pl.'s Reply at 2.)  Also, Defendant did not dispute this claim or otherwise raise questions about standing at the hearing.

§ 55-9-108(c), Plaintiff argues that the language used in the McBride-BAE settlement agreement fails to meet this standard.  In contrast, Plaintiff claims the GTF/MFC-McBride security agreement specifically enumerates the collateral subject to the agreement, as required by section 55-9-108(c). Thus, aside from the fact that MFC was first to perfect its security interest, BAE does not even have a security interest under the terms of the settlement agreement.

On June 7, 2002, the Court held a hearing on Plaintiffs' Motion, at which time it took the motion under advisement, and instructed the parties to submit their closing arguments in writing, as well as address in greater detail certain issues raised in their oral arguments.

## DISCUSSION

Rule 69(a) states in relevant part:

> Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise.  The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

FED. R. CIV. P. 69(a).

Under Rule 69(a), in the absence of governing federal law, this Court will apply the laws of New Mexico to the present dispute because Defendant obtained the writ of execution at issue in this case in the District of New Mexico.

Plaintiff essentially has requested that this Court order a permanent stay of execution of Defendant's judgment against McBride.  However, this Court does not have the authority under either federal or New Mexico law to issue stays of indefinite duration.  *See United States v. Denver & Rio Grande W. R.R.*, 223 F.2d 126, 127 (10th Cir. 1955) (unless relief is sought under Rule 60,

neither Federal Rules of Civil Procedure nor inherent authority allows federal courts to order permanent suspension of execution of a final judgment); *Segal v. Goodman*, 851 P.2d 471, 479 (1993) ("As a matter of law, a stay of execution of money judgment should not be indefinite in duration.").

In the present dispute, Plaintiff does not contest the validity of the judgment on which Defendant's writ of execution was issued.  Rather, Plaintiff contends that the property Defendant seeks to collect from McBride in satisfaction of the judgment is already pledged to it.  In other words, Plaintiff seeks a determination regarding the validity and priority of the liens asserted by Plaintiff and Defendant in the property of McBride, a common debtor.  If Plaintiff's lien is in fact superior to any interest that Defendant may have in McBride's property, then Defendant is precluded from seizing *that* property.  However, such a finding does not preclude Defendant from seeking collection on the judgment through other property or assets that McBride may possess and does not question the propriety of other claims Defendant may bring against McBride in satisfaction of that judgment.

## ANALYSIS

The issues before the Court can be summarized as follows: (1) whether Defendant has any valid interest in McBride's property; (2) whether Plaintiff's alleged security interest in McBride's property was a fraudulent transfer; and (3) if both parties have valid interests in the collateral, which party's interest takes priority.

Defendant BAE argues that the security agreement between MFC and McBride is invalid because no value was exchanged between the parties, as required under New Mexico's Commercial Code.  *See* N.M. STAT. ANN. § 55-9-203.  Defendant also urges the Court to set aside the GTF/MFC-McBride security agreement pursuant to the Court's equitable powers, as described in *Pepper v.*

*Litton*, 308 U.S. 295, 305 (1939).  In *Pepper*, the U.S. Supreme Court held that courts may "disallow or subordinate claims by necessity under certain 'cardinal principles of equity jurisprudence,'" including when "the transaction does not 'carry the earmarks of an arm's length bargain."  (Def.'s Closing Statement and Br. at 5 (quoting *Pepper*)).

Plaintiff refutes both of these claims, stating that the MFC-McBride security agreement is supported by an appropriate exchange of value under New Mexico law and reflects a legitimate, "arm's length" transaction.  (Pl.'s Closing Argument and Mem. Br. at 7-9, 14-16.)  Moreover, Plaintiff contends that the McBride-BAE settlement agreement did not give rise to a valid security interest because it does not describe the collateral at issue with sufficient particularity, as required by New Mexico law.  (Pl.'s Closing Argument and Mem. Br. at 4-5.)  At best, Plaintiff claims that Defendant holds a judgment lien against McBride's assets.  (Pl.'s Closing Argument and Mem. Br. at 5.)  Whatever interest Defendant may possess, Plaintiff argues that, under New Mexico's rules concerning perfection and priority of interests, Plaintiff's interest is superior to that of Defendant because Plaintiff perfected first by filing its financing statement before Defendant.  (Pl.'s Closing Argument and Mem. Br. at 5-7.)  Accordingly, any claims Defendant levies against the collateral are subordinate to Plaintiff's interest.

A.      **Whether the McBride-BAE Settlement Agreement Created a Valid Security Interest**

Under Article 9 of the New Mexico Commercial Code, a security interest in goods is not enforceable "against the debtor or third parties with respect to collateral" unless it has attached. N.M. STAT. ANN. § 55-9-203(b).  A security interest attaches only when:  (1) value has been given in support of the transaction; (2) the debtor has rights in the collateral or the power to transfer rights

-8-

in the collateral to a secured party; and (3) either the debtor has signed a security agreement containing a description of the collateral or the secured party has taken possession of the collateral. *See id.* As for this last requirement, Article 9 specifies further that certain minimum standards must be met for a description of collateral in a security agreement to be considered legally sufficient. Section 108 provides the general guideline that "a description of personal or real property [in a security agreement] is sufficient, whether or not it is specific, if it reasonably identifies what is described." *Id.* § 55-9-108(a). "A description of collateral as 'all the debtor's assets' or 'all the debtor's personal property' or using words of similar import does not reasonably identify the collateral." *Id.* § 55-9-108(c).

Paragraph 1.5 of the McBride-BAE settlement agreement states, "McBride agrees to grant BAE SYSTEMS a lien against *its assets* pursuant to Article I of the Uniform Commercial Code in the amount of $708, 356.13." (Settlement Agreement ¶ 1.5.) No other provision of the settlement agreement makes reference to any lien, security interest, or collateral. Given the prohibition on the use of generalized descriptions of collateral in section 55-9-108(c), the Court finds that the settlement agreement fails to grant Defendant any cognizable security interest because it does not describe the collateral at issue with sufficient particularity. *Accord In re Flores De New Mexico, Inc.,* 151 B.R. 571 (Bankr. D.N.M. 1993) (memorandum of understanding outlining terms of $1.1 million loan to Chapter 11 debtor and stating loan was secured by "the assets of the company" found insufficient to create security agreement in accounts receivable, despite reference to accounts receivable in loan agreement). Neither Defendant nor Plaintiff have pointed to any other documents that could be read as having granted Defendant a security interest in any of McBride's assets.

Plaintiff suggests that, at best, Defendant is "an unsecured creditor holding an unperfected judgment lien." (Pl.'s Closing Argument and Mem. Br. at 5.) To determine whether any other lien arose from the proceedings related to the December 2001 judgment against McBride and in favor of Defendant, federal law requires the Court to consult New Mexico law: under 28 U.S.C. § 1962, "[e]very judgment rendered by a district court within a State shall be a lien on the property located in such State in the same manner, to the same extent and under the same conditions as a judgment of a court of general jurisdiction in such State." 28 U.S.C. § 1962. Section 1962 further indicates that any state laws predicating the attachment of such a lien on some form of registration, recording, docketing, or similar act shall apply to federal court judgments "only if the law of such State authorizes the judgment of a court of the United States to be registered, recorded, docketed, indexed or otherwise conformed to rules and requirements relating to judgments of the courts of the State." *Id.* Thus, Defendant holds a lien against property of McBride located in the State of New Mexico only if (a) the judgment issued by the District Court in the Eastern District of Virginia may be considered a judgment rendered by a federal court in New Mexico, and (b) the requirements for creation of such a lien under New Mexico state law have been met.

The first inquiry is controlled by 28 U.S.C. § 1963, which provides that,

> A judgment in an action for the recovery of money or property entered in any court of appeals, district court, bankruptcy court, or in the Court of International Trade may be registered by filing a certified copy of the judgment in any other district ... when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown. ... A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.

28 U.S.C. § 1963.

-10-

Defendant filed the certified judgment with the United States District Court for the District of New Mexico on May 31, 2002.  Since that date is the earliest possible time that the Virginia judgment could be considered a judgment rendered by a federal court in the District of New Mexico under § 1963, that date is also the earliest possible time that Defendant could have acquired a lien against McBride's property in New Mexico.  *See also Western States Collection Co. v. Shain*, 490 P.2d 461, 462 (1971) ("The existence of a valid judgment is a prerequisite to the existence of the lien. The lien is for the amount of the judgment, secures it and provides a means for its enforcement.")

The Court need not decide whether Defendant complied with applicable New Mexico state practice and procedure because, even if Defendant had become a lien creditor of McBride as early as May 31, 2002, Defendant's claim would still be inferior to Plaintiff's security interest in the common collateral.

Under the New Mexico rules of perfection and priority applicable to these facts,

> (a)  A security interest ... is subordinate to the rights of
> ...
> > (2) ... a person that becomes a lien creditor before the earlier of the time:
> > (A) the security interest ... is perfected; or
> > (B) one of the conditions specified in Paragraph (3) of Subsection (b) of Section 55-9-203 NMSA 1978 is met and a financing statement covering the collateral is filed.

N.M. STAT. ANN. § 55-9-317(a)(2).

For purposes of subsection (A), the Code further provides that "a security interest is perfected if it has attached" and any other applicable requirements for perfection have been satisfied.  N.M. STAT. ANN. § 55-9-308(a).  By this measure, Plaintiff's security interest would have been perfected on

January 10, 2002.[5]  Under subsection (B), Plaintiff's security interest was perfected when it filed its

financing statement with the New Mexico Secretary of State on January 15, 2002.[6]

    With May 31, 2002 as the earliest possible date that Defendant could have held a valid

judgment lien against any property of McBride, there is no doubt that Plaintiff's security interest takes

priority because it was perfected at least four and a half months earlier.

---

[5]The requirements for attachment under New Mexico law – extension of value by secured party, possession of rights in collateral by debtor, and signing of security agreement by debtor describing collateral – were all met by this date.  *See* N.M. STAT. ANN. § 55-9-203 (attachment of security interest).  Plaintiff already had extended value to McBride in the previous months when GTF provided financing to create MFC and when MFC undertook expenses to continue McBride's former purchase-and-sale operations.  Additionally, McBride had rights in the collateral at the time that its representatives signed the security agreement.

[6]Subsection (B) cross-references section 55-9-203(b)(3), which states as follows:
    (b) Except as otherwise provided in Subsections (c) through (i) of this section, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
    ...
        (3) one of the following conditions is met:
            (A) the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;
            (B) the collateral is not a certificated security and is in the possession of the secured party under Section 55-9-313 NMSA 1978 pursuant to the debtor's security agreement;
            (C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 55-8-301 NMSA 1978 pursuant to the debtor's security agreement; or
            (D) the collateral is deposit accounts, electronic chattel paper, investment property or letter-of-credit rights, and the secured party has control under Section 55-9-104, 55-9-105, 55-9-106 or 55-9-107 NMSA 1978 pursuant to the debtor's security agreement.
N.M. STAT. ANN. § 55-9-203(b)(3).  With regard to Plaintiff's security interest, the corresponding security agreement was signed by McBride on January 10, 2002.

Having established the priority of Plaintiff's interest in the collateral at issue, the Court now turns to Defendant's arguments regarding the invalidity or fraudulent nature of the GTF/MFC-McBride security agreement from which Plaintiff's interest arises.

### B.      Whether GTF/MFC-McBride Security Agreement is Valid

Defendant argues that because neither GTF nor MFC gave value to McBride in exchange for the security interest in McBride's assets, the GTF/MFC-McBride security agreement is invalid under New Mexico law.  (Def.'s Closing Statement and Br. at 2-5.)  Defendant also argues that the security agreement is void under New Mexico's Uniform Fraudulent Transfers Act, N.M. STAT. ANN. §§ 56-10-14 to 56-10-25, as well as under common law prohibitions against fraud and misrepresentation.  (Def.'s Closing Statement and Br. at 6-12.)  Finally, Defendant urges the Court to disallow or subordinate the GTF/MFC-McBride security agreement under considerations of equity because the transaction was unfair and not conducted at arm's length.  (Def.'s Closing Statement and Br. at 5-6.)

#### 1.      Attachment of security interest

Defendant contends that the security agreement on which Plaintiff relies fails to meet the first condition for attachment of a security interest under the New Mexico Commercial Code, *see* N.M.. STAT. ANN. § 55-9-203(b), because Plaintiff did not extend any value to McBride in return for the security interest.  However, for the reasons outlined below, this claim fails.

Section 55-1-201 states that

a person gives "value" for rights if he acquires them:
(a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection;
(b) as security for or in total or partial satisfaction of a pre-existing claim;
(c) by accepting delivery pursuant to a pre-existing contract for purchase; or

-13-

(d) generally, in return for any consideration sufficient to support a simple contract;

N.M. STAT. ANN. § 55-9-201(44).

Defendant argues that "[t]here is no evidence whatsoever that GTF gave any value directly to McBride" to support its security agreement and that any money McBride owed to GTF had been paid in full prior to execution of the agreement.  (Def.'s Closing Statement and Br. at 2-3.)  Defendant also argues that no value was exchanged to support any security agreement between MFC and McBride.  Although MFC "alleges that the security agreement is premised on a debt that arose from 'set up' fees, an IBM credit application fee, attorneys' fees and service fees to register MFC in multiple states" and that these charges were "paid by or incurred by MFC on behalf of McBride," Defendant contends that, essentially, "MFC is a shell company created by Theresa McBride, owner of McBride, to serve the sole purpose of maintaining business relations with vendors and creditors." (Def.'s Closing Statement and Br. at 3, 4.)  Defendant explains that, "[h]ad McBride truly been indebted to MFC for all services alleged by MFC, the security agreement would have been executed at the time MFC was formed in August, 2001" and not nearly six months later, "well after the lawsuit between McBride and BAE was underway, BAE had obtained its judgment, and ... McBride realized that it needed to protect its assets."  (Def.'s Closing Statement and Br. at 4-5.)

New Mexico state law does not require that a secured party give value "directly" to a debtor in order to create a valid security agreement.  The Official Comment to § 55-9-201(44) notes that the definition of "value," in the context of security agreements, encompasses "any consideration sufficient to support a simple contract, including the taking of property in satisfaction of or as security for a preexisting claim." N.M. STAT. ANN. § 55-9-201(44), comment.  Under general contract principles,

"[i]t matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous."  RESTATEMENT (SECOND) OF CONTRACTS § 71 **(2002)**.  "The consideration given by the promisee need not move to the promisor; a benefit conferred upon a third person, at the request of the promisor, may constitute sufficient consideration for the promise."  *Id.* § 89; *see also Knox v. First Sec. Bank of Utah*, 196 F.2d 112, 118 (10th Cir. 1952) ("It is not necessary that the consideration pass directly from the obligee to the obligor. It is sufficient if there be detriment or disadvantage to the obligee and an element of benefit or advantage to the obligor, or to a third person at his request."); *Wester v. Trailmobile Co.*, 279 P.2d 526, 528 (N.M. 1955) ("[T]here is a sufficient consideration for a promise if there is any benefit to the promisor or any loss or detriment to the promisee. It is not necessary that a benefit should accrue to the person making the promise; it is sufficient that something valuable flows from the person to whom it is made, or that he suffers some prejudice or inconvenience, and that the promise is the inducement to the transaction.")

John Irick, Chief Financial Officer of McBride, testified that GTF offered to finance and establish a special purpose entity that would allow McBride to stay in business by accepting purchase orders on behalf of McBride, using its own line of credit to acquire products to fill the orders, and delivering the products to the buyers.  (Trans. at 38, 41.)  Once McBride agreed to enter into this arrangement, GTF established MFC as a limited liability corporation, wholly owned by GTF, to serve as that special purpose entity in June 2001.[7]

---

[7]The specifics of the relationship between MFC and McBride are outlined in the Management Agreement entered into by McBride and MFC in August 2001.  (Pl.'s Exh. 7.)

-15-

Phil Ross, vice president of GTF and general manager of MFC, testified that GTF "provided the capital to form McBride Financial Corp, and actually advanced funds for various setup costs before McBride Financial Corp was even in existence." (Trans. at 113-14.)   A more detailed explanation of the value provided by GTF to support the security agreement is found in the letter agreement sent from GTF to McBride (Letter from GTF to McBride of 6/29/2001), which was signed and agreed to by representatives of each and which outlines the obligations of each party in this transaction.   In relevant part, the letter agreement indicates that McBride agreed to pay GTF a fee of $100,000, "[a]s consideration for GTF's structuring and financing of the transactions contemplated by the Management Agreement," which outlines the obligations and relationship between McBride and MFC, as well as all out of-pocket fees and reasonable expenses incurred by GTF or MFC as they become due and payable in connection with:  (i) the formation of MFC, (ii) the establishment of a new credit facility with IBM Credit Corporation which the proceeds thereof shall be used to finance the product to be serviced by McBride under the Management Agreement, (iii) the development, preparation and execution of, or any amendment, supplement, or modification to, the Management Agreement and any other documents prepared in connection therewith (including this letter) and (iv) all fees and disbursements of counsel to GTF or MFC in connection with the foregoing.(Letter from GTF to McBride of 6/29/2001, ¶ 1.)

Even aside from these expenses, GTF agreed to "use commercially reasonable efforts to assist McBride in sourcing adequate capital resources in order to support the financing of product under the Management Agreement" for the life of that agreement.  (Letter from GTF to McBride of 6/29/2001, ¶ 2.)  The Operating Agreement of MFC indicates that GTF financed the creation of MFC through an initial capital contribution of $1,500,000.  (Pl.'s Exh. 5, at B-1.)

-16-

Meanwhile, MFC itself has invested "at least $435,724 in rehabilitating McBride" and, since the signing of the security agreement, has incurred "additional liabilities, including recovery of funds that were erroneously misapplied to another of McBride's lender [sic], equipment purchases, and customer deductions from receivables." (Pl.'s Closing Argument and Mem. Br. at 12; Trans. at 60-64.)

Thus, it is clear that both GTF and its subsidiary MFC have provided value, as required by New Mexico law for valid attachment of a security interest, through (1) GTF's initial capitalization of MFC, an entity created for the benefit of McBride, (2) various other expenditures made by both GTF and MFC in association with the creation of MFC, and (3) expenses undertaken by MFC to procure a line of credit from IBM and to continue McBride's purchase-and-delivery operations.[8] (Letter from GTF to McBride of 6/29/2001; Pl.'s Exh. 10 (Schedule of set-up fees & debt obligations of McBride to MFC).)

### 2. Uniform Fraudulent Transfers Act

Defendant next argues that the GTF/MFC-McBride security agreement violates numerous provisions of New Mexico's Uniform Fraudulent Transfer Act (UFTA), N.M. STAT. ANN. §§ 56-10-14 to 56-10-25. New Mexico's UFTA was adopted in 1987 to replace the state's Uniform Fraudulent Conveyance Act (UFCA), see N.M. STAT. ANN. §§ 56-10-1 to 56-10-13 (Repl.

---

[8] Defendant also alleges that "MFC has served virtually no purpose" and that "there are no real distinctions between McBride and MFC or the manner in which McBride conducts its business since becoming the so called 'agent' of MFC" as evidence that the underlying security agreement is invalid. (Def.'s Closing Statement and Br. at 4.) However, except for cases dealing with fraudulent transfers, see discussion infra, Defendant cites no case law or statute specifically imposing requirements that security agreements serve any "purpose" or that some degree of separation exist between the parties to such an agreement. Moreover, the evidence presented at the hearing demonstrates that MFC has provided services to GTF that carry commercial value.

Pamp.1986) (former Uniform Fraudulent Conveyance Act).  "The basic structure and approach of the Uniform Fraudulent Conveyance Act are preserved in the Uniform Fraudulent Transfer Act." UNIF. FRAUDULENT TRANSFER ACT REFERENCES & ANNOTS., 7A U.L.A. 269 (1999).  The UFTA, as adopted by New Mexico, follows its predecessor in permitting a creditor to void "a transfer or obligation that is constructively fraudulent [i.e., without regard to actual intent] because insolvency concurs with or follows failure to receive adequate consideration" for the exchange, so long as the creditor was in existence when the transfer occurred.  *Id.*

Section 19 of New Mexico's UFTA provides that transfers are fraudulent as to present creditors if "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation" or if "the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."  N.M. STAT. ANN. § 56-10-19.  Thus, to prove that a transfer is fraudulent under this provision, a claimant must prove that the debtor was insolvent at the time of the exchange or, if the transfer was not to an insider for a pre-existing debt, that the exchange left the debtor insolvent.  As for the insolvency element, the UFTA specifies that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation" and that a "debtor who is generally not paying his debts as they become due is presumed to be insolvent."  N.M. STAT. ANN. § 56-10-16(A), (B).

To prevail on a fraudulent transfer claim, "[a]ll the elements of fraud required by the statute, including insolvency, must be proven by clear and convincing evidence."  *First Nat'l Bank v. Abraham*, 639 P.2d 575, 579 (N.M. 1982) (decided under UFCA).  Furthermore, the New Mexico

Supreme Court has stated that, when presented with an allegation of constructive fraud, it is erroneous for the trial court to "rel[y] upon answers given by a witness to hypothetical questions based upon the witness's opinion, rather than upon documented evidence of fair market value" in deciding whether a debtor was insolvent.  *W. Prod. Credit Ass'n v. Kear*, 723 P.2d 965, 966 (N.M. 1986) (decided under UFCA).

Defendant claims that the definitions of insolvency under both sections 56-10-16(A) and (B) have been established by the evidence presented at the hearing.  Specifically, Defendant states that because "it was undisputed that McBride would have likely gone out of business had MFC not been created," the "[t]estimony clearly showed that McBride's debts go well beyond its assets." (Def.'s Closing Statement and Br. at 7.)  However, beyond this conjecture and generalized description of McBride's asset-debt ratio, Defendant has not presented the Court with evidence that McBride's debts exceeded its assets at a "fair valuation."   At most, John Irick testified that McBride started facing serious financial difficulties in 1999 (Trans. at 37-38) and that he believed at the time that IBM's termination of credit would have put McBride out of business (Trans. at 40-41, 45).

Defendant argues that the definition of insolvency under section 56-10-16(B) has been met because "McBride is not wanting for creditors seeking payment and has admitted that there are multiple creditors, not just BAE, waiting for payment."  (Def.'s Closing Statement and Br. at 7.) However, section 56-10-16 does not state that a party is insolvent if it has outstanding debts; rather, it indicates that a debtor is considered insolvent for fraudulent transfer purposes if it he generally defaulting on payments to creditors.  Thus, the existence of multiple creditors is not by itself proof that a debtor is insolvent absent evidence that he is not making payments on those obligations as they

come due.  Defendant has not proven by clear and convincing evidence that McBride was failing to meet its debt obligations generally when it entered into the security agreement with GTF and MFC.

Neither the trial testimony nor Defendant's submissions to the Court contain any additional evidence -- qualitative or quantitative -- of McBride's financial situation or of its asset-debt ratio at the time it entered into the security agreement with GTF and MFC.  Accordingly, the Court finds that Defendant has not met its burden of establishing by clear and convincing evidence that McBride was insolvent when the security agreement was executed, or that it became insolvent shortly thereafter, as is required under Section 19 of New Mexico's UFTA.

Defendant also has based its fraudulent transfer claim on Section 18 of New Mexico's UFTA, which states that transfers are fraudulent as to present creditors

> if the debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (ii) intended to incur, or believed or reasonably should have believed that he [or she] would incur, debts beyond his [or her] ability to pay as they became due.

N.M. STAT. ANN. § 56-10-18(A).

"The intent required to establish actual fraud may be established by circumstantial evidence, or by inferences drawn from a course of conduct."  *In re Jones*, 184 B.R. 377, 385-86 (Bankr. D.N.M. 1995)(citing *Farmers Coop. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982)). Subsection (b) provides a non-exhaustive list of factors that may be considered in determining whether a debtor

possessed "actual intent" for purposes of this statute.[9]  Evidence establishing the existence of "one or more of these 'badges of fraud' does not create a presumption that the transfer was fraudulent, [but] proof of several badges may afford a basis to infer fraud."  *Id.* (citations omitted).  While evaluating whether the badges of fraud exist in a given case, "a court should evaluate all the relevant circumstances involving a challenged transfer or obligation" and, thus, "may appropriately take into account all indicia negativing as well as those suggesting fraud."  UNIF. FRAUDULENT TRANSFER ACT §4 cmt. 6,  7A U.L.A. 303 (1999).

Defendant argues that evidence of McBride's "actual intent" lies in the following facts:  (1) the transfer of assets was made to an "insider" since Theresa McBride is not only owner and majority shareholder of McBride, but also "the person to create and presumably exercise control over MFC"; (2) "McBride retained possession and control of the transferred property after the transfer" since no payments have been made to GTF or MFC on the alleged debt underlying their security agreement; (3) the transfer was made after McBride had been sued; (4) the transfer involved "substantially all"

---

[9]The enumerated list of factors includes consideration of whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
N.M. STAT. ANN. § 56-10-18(B).

of McBride's assets; (5) McBride was insolvent at the time of the transfer or became insolvent shortly after it was made; and (6) the transfer was made shortly after McBride incurred a substantial debt (namely, the BAE judgment against McBride).  (Def.'s Closing Statement and Br. at 8.)

Addressing each of Defendant's contentions in turn:

*Whether transfer was to an insider.*  In cases where the debtor is a corporation, New Mexico's UFTA defines an "insider" as, "(a) a director of the debtor; (b) an officer of the debtor; (c) a person in control of the debtor; (d) a partnership in which the debtor is a general partner; (e) a general partner in a partnership described in Subparagraph (d) of this paragraph; or (f) a relative of general partner, director, officer or person in control of the debtor."  N.M. STAT. ANN. § 56-10-15(G)(2).  Neither MFC nor GTF can be considered insiders under any of the definitions provided here.  Even if they could be considered insiders, Defendant has pointed to no direct or circumstantial evidence that MFC or GTF had control over McBride.  In fact, John Irick testified that MFC has no authority over McBride's corporate policies, disposition of assets, personnel or management decisions, payment of expenses, or any daily decision making of McBride.  (Trans. at 94-95.)

Defendant wrongly focuses on Theresa McBride as the purported common link between debtor and creditor and whose relationship between McBride and MFC makes the transfer one that was made to an insider.  However, the transfer was made to GTF and MFC, not to Theresa McBride; thus, if there is to be any allegation about conveyances to insiders, those corporations must be alleged to be the insiders, not Theresa McBride.  As explained above, there is no evidence before the Court indicating that either GTF or MFC are "insiders" vis-a-vis McBride.  McBride and MFC share no "officers, directors, or employees" and no officers, directors, or employees of the two companies are related.  (Trans. at 94-95.)

*Whether debtor retained possession and control over transferred property*.  The transfer at issue here involves not tangible property per se, but only a security interest in various assets.  There is nothing out of the ordinary in having a debtor retain possession of property that is the subject matter of a security agreement.  The debtor has certain responsibilities with respect to the collateral, but is not required and, depending on the circumstances, not necessarily expected to give the collateral to the creditor in the absence of a triggering event such as default.  That McBride continues to carry an unpaid debt to MFC is not necessarily a sign that the transfer was fraudulent.  Indeed, the existence of the debt is precisely why the transfer (i.e., the giving of the security interest) was made.  Defendant has not offered convincing proof that the basis of the debt is a sham or otherwise of questionable validity.  Defendant's argument that McBride continues to retain possession of the collateral or money owed to MFC and GTF is thus unpersuasive as an indicia of fraudulent intent.

*Timing of the transfer.*  McBride entered into the security agreement with GTF and MFC in January 2002.  Defendant had entered into a settlement agreement with McBride in December 2001 which included a schedule of payments McBride was to make to Defendant.  Additionally, the transfer to GTF and MFC was made after McBride had incurred numerous debts.  In addition to the adverse judgment on which Defendant's claim is premised, McBride had various other secured creditors to whom it owed money.  (Trans. at 50, 53.)  Although this factor alone will not prove that McBride acted with the intent to defraud, hinder, or delay, it does weigh in favor of such a finding.

*Whether transfer involved all debtor's assets*.  The GTF/MFC-McBride security agreement provides a detailed list of the property subject to the security interest that McBride was granting.  Indeed, the agreement appears to list nearly all of McBride's assets as collateral.  Defendant has not

pointed to any evidence indicating that the promise of all assets was incommensurate with the amount of value given by the secured parties to McBride.

*Whether debtor was insolvent at the time of or shortly after the transfer.*  As explained above, Defendant has not provided clear and convincing evidence that McBride was insolvent when the security agreement was signed or that it became insolvent shortly thereafter.

Even though some of the above factors are suggestive of fraud, the record contains ample evidence suggesting that the transfer was undertaken for bona fide business purposes and negating any indication of fraudulent intent.[10]  John Irick testified that, prior to entering into any agreement with GTF, McBride met with its creditors to explain the offer that was being made by GTF and started a creditor committee (of which Defendant was a member) "to create a forum so that [McBride could] deal[] with all of our creditors equitably and evenly, and keep the bulk of the creditors from filing an involuntary bankruptcy."  (Trans. at 39.)  In other words, the transaction was undertaken with full disclosure.  Witness testimony also indicated that the security agreement was executed in order to rehabilitate McBride and enable it to continue business operations, not to evade its then-existing creditors.

_____

[10]Although Plaintiff relies on the statutory defenses provided in section 56-10-23 to argue that the GTF/MFC-McBride security agreement is not voidable under the UFTA, regardless of McBride's intent, the Court need not address whether Defendant has met the requirements of that statute.  The initial burden of proving fraudulent intent is on the party seeking to avoid the transaction.  Here, Defendant has not made a sufficient evidentiary showing that McBride entered into the security agreement with an intent to defraud.  Thus, the burden has not shifted to Plaintiff to raise any complete defenses to Defendant's case.  Accordingly, the discussion of evidence suggesting that the security agreement was entered into validly is part of the Court's evaluation of the complete circumstances surrounding the transaction and not whether Plaintiff has met the requirements for establishing a defense under section 56-10-23.

Although the timing of the transfer remains suspect and McBride does appear to have pledged all its assets under the security agreement, the fact that the security interest was supported by adequate consideration militates against finding the transfer to have been fraudulent on that basis. "As of January 2002, MFC had invested $435,724 in rehabilitating McBride," and, by April 2002, that amount had increased to $1,024,000 due to additional expenditures made and liabilities incurred by MFC in the course of continuing operations pursuant to the Management Agreement.  (Pl.'s Closing Argument & Mem. Br. at 12; Trans. at 55-64; Pl. Exh. 10.)  Defendant has not marshaled sufficient evidence to raise doubts as to whether the transaction reflected a mutually equivalent exchange of value or to otherwise suggest that the encumbering of all of McBride's assets was excessive as compared to the value given by GTF and MFC.[11]  Accordingly, the Court finds that there is insufficient evidence to support a finding of actual fraudulent intent by McBride for purposes of a fraudulent transfer claim.

## C.    Common Law Fraud and Misrepresentation

Defendant also argues that the GTF/MFC-McBride security agreement should be set aside because McBride committed common law fraud or misrepresentation against Defendant by entering into that agreement, "[d]espite full knowledge that [its] assets had been pledged to BAE" under the December 2001 Settlement Agreement and Virginia District Court judgment.  (Def.'s Closing Statement and Br. at 10.)

---

[11]For these same reasons, the Court finds that Defendant cannot maintain a claim of fraudulent transfer under section 56-10-18(A)(2), which requires Defendant to prove that McBride did not receive "reasonably equivalent value in exchange for the transfer or obligation" being challenged. N.M. STAT. ANN. § 56-10-18(A)(2).

Under the common law, "[a]ctionable fraud consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment." *Cargill v. Sherrod*, 631 P.2d 726, 727-28 (N.M. 1981). "There must be a concurrence of all of these essential elements and without this there can be no actionable fraud. None can be presumed, but each must be shown by clear and convincing evidence." *Eoff v. Forrest*, 789 P.2d 1262, 1266 (N.M. 1990) (quoting *Sauter v. St. Michael's Coll.*, 374 P.2d 134, 138 (N.M. 1962)). "Failure to disclose facts may be a misrepresentation under some circumstances." *Otero v. Jordan Rest. Enters.*, 922 P.2d 569, 574 (N.M. 1996) (citation omitted).

Defendant claims that the "indicia of intent" offered as evidence of McBride's "actual intent to hinder, delay, or defraud" for the UFTA claim also establish the requisite "intent to deceive" for common law fraud. (Def.'s Closing Statement and Br. at 11.) However, the Court has found that Defendant did not present clear and convincing evidence of fraudulent intent under the UFTA. As Defendant advances no additional evidence of intent for the common law fraud claim, the Court finds that Defendant has not provided sufficient evidence for the intent element of this claim either. Accordingly, the Court need not address whether the other elements of common law fraud have been met.

In contrast with the common law fraud claim, one only need prove the elements of a negligent misrepresentation claim by a preponderance of the evidence. *See Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 953 P.2d 722, 735 (N.M. Ct. App. 1997). "In New Mexico, to recover under a claim of negligent misrepresentation, also referred to as negligence by words, the offending party must have breached a duty of disclosure owed to the injured party, the injured party must have had a right to rely on the misinformation, and it must have sustained damages." *Ruiz v. Garcia*, 850 P.2d

-26-

972, 977 (N.M. 1993).  Principles of negligence law apply with equal force to the claims of negligent

misrepresentation.  *See id.*  Additionally, New Mexico courts have distinguished

> the elements of negligence and fraud as follows: (1) fraudulent misrepresentation
> requires an untrue statement, while negligent misrepresentation may involve a
> statement that is 'literally true' but misleading; (2) fraudulent misrepresentation
> requires the defendant to make the statement recklessly or with knowledge that it is
> false, while negligent misrepresentation only requires a failure to exercise ordinary
> care in obtaining or communicating the statement; (3) fraudulent misrepresentation
> requires an intent to deceive, while negligent misrepresentation only requires an intent
> that the plaintiff receive and be influenced by the statement where it is reasonably
> foreseeable that the plaintiff would be harmed if the information conveyed was
> incorrect or misleading.

*Id.*

Defendant argues that, "[a]t the very least, McBride misrepresented to BAE that payments

were forthcoming, that the assets were secured by BAE and that McBride was dealing in good faith."

(Def.'s Closing Statement and Br. at 11.)  Defendant alleges it relied on these misrepresentations and

waited for payments to be made before attempting to enforce its judgment against McBride.  As a

result of their reliance and the resulting delay in collecting on the judgment, Defendant has suffered

injury.

The preliminary question in the present case is whether McBride owed Defendant any duty

of care that was violated either by its statements to Defendant that payments under the settlement

agreement would be made as scheduled or by any other action.  Defendant has not pointed to any

such duties or obligations.  The settlement agreement does not impose any explicit obligations on

McBride with regard to informing Defendant as to the status of payments or of McBride's financial

condition generally.  Nor does the agreement include any provision limiting the ability of McBride

to transfer or encumber its assets.  At most the settlement agreement, which is a contract, can be read

as implicitly containing a duty of good faith and fair dealing.  However, McBride was not under any duty *to inform* Defendant as to whether payments would be made according to the schedule agreed to in the settlement – McBride was only under an obligation to meet those deadlines.  Accordingly, any statements McBride made to Defendant as to whether McBride would be able to make payments as agreed to were made voluntarily and not under any duty.  Without any duty, there can be no breach of obligation as required under principles of negligence generally and for purposes of prevailing on a negligent misrepresentation claim in particular.

Even if this Court were to read Defendant's claim as alleging a violation of the duty of good faith implicit in a contract, Defendant has not established by a preponderance of the evidence that McBride failed "to exercise ordinary care" in communicating to Defendant that it was attempting to make payments as promised under the security agreement.

Thus, Defendant's negligent misrepresentation claim must fail.

**D.   Equitable Subordination and Disallowance**

Should the Court find the GTF/MFC-McBride security agreement to be formally valid, Defendant requests in the alternate that this Court "disallow or subordinate" the security agreement pursuant to the court's equitable authority.  Relying on *Pepper v. Litton*, 308 U.S. 295 (1939), Defendant urges that the agreement be disregarded because it carries "none of the earmarks of an arm's length bargain."  (Def.'s Closing Statement and Br. at 6.)  In support of this characterization of the transaction, Defendant emphasizes that (1) "Theresa McBride is a the majority shareholder and owner of McBride as well as being [sic] the creator of MFC"; (2) "Michelle Montano, an employee of McBride, was identified by MFC on its corporate filings with the New Mexico Public Regulatory Commission as an organizer of MFC"; (3) witness testimony described MFC as a "grand extension

-28-

of McBride" and indicated that MFC "could not function without McBride."  (Def.'s Closing Statement and Br. at 6.)

Plaintiff argues that Defendant's claim must fail, first and foremost, because equitable subordination is a remedy available under federal bankruptcy laws, and McBride has not applied for bankruptcy protection.  (Pl.'s Closing Argument & Mem. Br. at 13.)  However, Plaintiff fails to recognize that the enactment of the Bankruptcy Code was only the first instance of *statutory* recognition of the remedy.  In *Pepper v. Litton*, the U.S. Supreme Court discussed equitable subordination as a form of relief flowing from the equity powers of bankruptcy courts.  *Id.* at 304-05, cited by *Kennedy Elec. Co., Inc. v. United States Postal Serv.*, 508 F.2d 954, 957 (10th Cir. 1974) ("A court of equity may subordinate a claim because of equitable considerations.")  It is well-established that federal courts have equitable powers.  *See e.g., United States v. Brown*, 331 F.2d 362, 365 (10th Cir. 1964) ("[T]he inferior Federal courts are creatures of statute but, nevertheless, historically, they are possessed with the inherent equitable powers of common law courts.")  Thus, equitable subordination is a remedy that is available outside bankruptcy proceedings.

In *In re Eufala Industrial Authority*, 266 B.R. 483 (B.A.P. 10th Cir. 2001), the Bankruptcy Appellate Panel for the Tenth Circuit provided a thorough explanation of the standard to be applied in an equitable subordination case.  "Building on the premise articulated in [*Pepper*] that 'simply the violation of rules of fair play and good conscience' by a claimant justifies equitable subordination of a claim, many courts, including the Tenth Circuit, have developed a three-part test to determine whether equitable subordination is appropriate."  *Id.* at 488 (citation omitted).  A party seeking such relief must establish that (a) the creditor whose claim is sought to be subordinated engaged in inequitable conduct; (b) such conduct injured other creditors or gave an unfair advantage to the

-29-

claimant; and (c) subordination of the claim is not contrary to the Bankruptcy Code. *See id.* at 488-89 (citing *In re Castletons*, 990 F.2d 551, 559 (10th Cir. 1993)). Bare allegations that a creditor engaged in inequitable conduct are insufficient. *See id.* at 489. The party requesting subordination must describe conduct that fits within one of the scenarios in which courts have traditionally awarded such relief: "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, [or] (3) control or use of the debtor as an alter ego for the benefit of the claimant." *Id.* (quotations and citation omitted).

The requisite showing also varies depending on whether the transaction sought to be subordinated was made by an insider or fiduciary, as opposed to a non-insider creditor. *Id.* While in the case of the insider-creditor, one only needs to show "unfair conduct," in situations involving non-insider creditors, because of the lack of any "fiduciary or contractual duty to the other creditors of the debtor," one must show that their actions involved a greater degree of wrongful conduct. *Id.* "The majority of courts have described the degree of wrongful conduct warranting equitable subordination of a non-insider's claim as 'gross and egregious,' 'tantamount to fraud, misrepresentation, overreaching or spoliation,' or 'involving moral turpitude.'" *Id.* (citations omitted). The Tenth Circuit has held that, in order to survive a motion to dismiss, a party's equitable subordination claim against a non-insider creditor must involve allegations of "egregious conduct" such as "gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation." *In re Castletons*, 990 F.2d at 559 (quotations and citations omitted).

In this case, Defendant seeks equitable subordination of Plaintiff's security agreement with McBride.   Plaintiff is not an "insider," as that term is defined in the Bankruptcy Code,[12] nor is he a fiduciary, as understood under general corporate theory.  *See In re N & D Props., Inc.*, 799 F.2d 726, 731-32 (11th Cir. 1986) ("A fiduciary, under general corporate theory, includes an officer, director, agent, majority shareholder or a minority shareholder exercising actual control over the corporation.") Because Plaintiff is best understood as a non-insider creditor, Defendant must show that Plaintiff's conduct was "'gross and egregious,' 'tantamount to fraud, misrepresentation, overreaching or spoliation,' or 'involving moral turpitude.'"  *In re Castletons*, 990 F.2d at 559 (citation omitted). However, Plaintiff was not a party to or otherwise immediately involved in any transactions with Defendant.  At the hearing, Phil Ross, vice-president of GTF and general manager of MFC, testified that in fact he did not know of the BAE-McBride litigation when MFC was created (Trans. at 111). Nowhere does Defendant allege or does the record reveal any instance where Plaintiff had *any* correspondence or interactions with Defendant prior to initiation of these proceedings.  Rather, Defendant focuses on the conduct of McBride and its officers in support of its claim of equitable subordination.  However, the remedy is available against other creditors, not the common debtor.

---

[12]The Bankruptcy Code defines "insider" as follows:
> (B) if the debtor is a corporation--
>> (i) director of the debtor;
>> (ii) officer of the debtor;
>> (iii) person in control of the debtor;
>> (iv) partnership in which the debtor is a general partner;
>> (v) general partner of the debtor; or
>> (vi) relative of a general partner, director, officer, or person in control of the debtor;

11 U.S.C. § 101(31)(B).

Therefore, the Court finds Defendant has not established adequate grounds for the grant of equitable relief.

<u>**CONCLUSION**</u>

Under the applicable New Mexico statutes governing the creation and perfection of security interests, Plaintiff's security interest is both valid and superior to any interest that Defendant might hold in any assets of McBride.  The Court does not have the authority to order a permanent stay of the writ of execution on Defendant's judgment against McBride.  As the judgment itself remains valid, this Court can only order that Defendant's writ of execution be satisfied without impinging on any of Plaintiff's rights in McBride's assets.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Stay of Writ of Execution **[Doc. No. 2]** is hereby **GRANTED as to the assets discussed herein.**

Dated this 14th day of April, 2003.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Frank Salazar

<u>Attorney for Defendant</u>:
Sam Bregman

<u>Attorney for McBride</u>:
Robert Jacobvitz